# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

GEORGE SCHEULEN, Derivatively on
Behalf of KRISPY KREME, INC.,

      Plaintiff,

    v.

MARISSA ANDRADA, JEREMIAH
ASHUKIAN, DAVID BELL, PATRICIA
CAPEL, JOSHUA CHARLESWORTH,
DAVID DENO, OLIVIER GOUDET, PAUL
MICHAELS, GERHARD PLEUHS, DEBBIE
ROBERTS, PHILIP TELFER, and
MICHELLE WEESE,

      Defendants,

   and

KRISPY KREME, INC.,

      Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. _____

JURY TRIAL DEMANDED

## <u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff George Scheulen ("Plaintiff"), by and through his undersigned attorneys, brings

this derivative complaint for the benefit of nominal defendant Krispy Kreme, Inc. ("Krispy Kreme"

or the "Company"), against its Board of Directors (the "Board") and certain of its executive

officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties

and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to

himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*,

the investigation conducted by and through Plaintiff's attorneys, which included, among other

things, a review of the Company's publicly available documents, conference call transcripts and

public announcements, United States Securities and Exchange Commission ("SEC") filings, press

releases published by and regarding Krispy Kreme, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

<u>**NATURE OF THE ACTION**</u>

1.      This is a shareholder derivative action brought on behalf of Krispy Kreme against certain officers and members of the Company's Board for breaches of their fiduciary duties that occurred between February 25, 2025 through May 7, 2025, inclusive (the "Relevant Period"), as set forth below.

2.      According to its public filings, Krispy Kreme is one of the most well-known sweet treat brands in the world. The Company's Original Glazed® doughnut is universally recognized. Krispy Kreme operates in more than forty countries through its unique network of fresh doughnut shops, partnerships with leading retailers, and a rapidly growing digital business with more than 17,500 fresh points of access.

3.      On October 26, 2022, Krispy Kreme began a small-scale test to offer doughnuts at McDonald's Corporation ("McDonald's") restaurants located in Louisville, Kentucky and the surrounding area.

4.      On March 26, 2024, the Company announced the expansion of its partnership with McDonald's Corporation ("McDonald's") nationwide, which would begin in the second half of 2024.

5.      The Company's plan, however, was more challenging than anticipated, and sales of the Company's doughnuts in McDonald's fell significantly after the partnership announcement.

6.      Then on May 8, 2025, Krispy Kreme announced that its "net revenue was $375.2 million," which was "a decline of 15.3%."

7. Moreover, the Company announced a "net loss of $33.4 million, compared to prior year net loss of $6.7 million."

8. Furthermore, Krispy Kreme disclosed that it was "reassessing [its] deployment schedule together with McDonald's" and "withdrawing [its] prior full year outlook and not updating it" as a result of, at least in part, "uncertainty around the McDonald's deployment schedule."

9. Following this news, Krispy Kreme's stock price fell nearly twenty-five percent, from a close of $4.33 per share on May 7, 2025 to a close of $3.26 per share on May 8, 2025.

10. As a result of the foregoing and as set forth in greater detail herein, a securities fraud class action was filed against the Company, captioned *Cameron v. Krispy Kreme, Inc.*, Case No. 3:25-cv-00332 (W.D.N.C.) (the "Securities Class Action").

11. The Securities Class Action has caused, and will continue to cause, Krispy Kreme to expend significant funds to defend itself against the claims asserted in that action, and exposed the Company to massive potential class-wide liability.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") (15 U.S.C. § 78j(b)) and Section 21D of the 1934 Act (15 U.S.C. § 78u-4(f)).

13. Plaintiff's claims also raise a federal question relating to the claims made in the Securities Class Action based on violations of the 1934 Act.

14. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

3

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Company's principal executive officers are located in this District.

## PARTIES

### Plaintiff

17.     Plaintiff is, and has been at all relevant times, a shareholder of Krispy Kreme.

### Nominal Defendant

18.     Krispy Kreme is a Delaware corporation with its principal executive offices located at 2116 Hawkins Street, Charlotte, North Carolina 28203. The Company's common stock trades on NASDAQ under the ticker symbol "DNUT."

### Individual Defendants

19.     Defendant Marissa Andrada ("Andrada") has served as a director of Krispy Kreme since February 2022. Andrada serves as Chair of the Remuneration & Nomination Committee.

20.     Defendant Jeremiah Ashukian ("Ashukian") has served as Chief Financial Officer ("CFO") and Executive Vice President of Krispy Kreme since January 2023. Ashukian is named as a defendant in the Securities Class Action.

21.     Defendant David Bell ("Bell") served as a director of Krispy Kreme from September 2016 until June 2025.

4

22.     Defendant Patricia Capel ("Capel") has served as a director of Krispy Kreme since June 2024.

23.     Defendant Joshua Charlesworth ("Charlesworth") has served as Chief Executive Officer ("CEO"), President, and a director of Krispy Kreme since January 2024. On April 4, 2025, while Krispy Kreme's stock price was artificially inflated and based on inside information, Charlesworth sold 5,943 shares of Krispy Kreme common stock for an average of $4.47 per share, netting proceeds of $26,565. Moreover, on May 1, 2025, Charlesworth sold 7,638 shares of Krispy Kreme common stock for an average of $4.10 per share, netting proceeds of $31,316. Charlesworth is named as a defendant in the Securities Class Action.

24.     Defendant David Deno ("Deno") has served as a director of Krispy Kreme since September 2016. Deno serves as Chair of the Audit & Finance Committee.

25.     Defendant Olivier Goudet ("Goudet") served as a director of Krispy Kreme from September 2016 until June 2025.

26.     Defendant Paul Michaels ("Michaels") served as a director of Krispy Kreme from May 2017 until June 2025.

27.     Defendant Gerhard Pleuhs ("Pleuhs") has served as a director of Krispy Kreme since June 2022. Pleuhs serves as a member of the Audit & Finance Committee and a member of the Remuneration & Nomination Committee.

28.     Defendant Debbie Roberts ("Roberts") served as a director of Krispy Kreme from April 2021 until June 2025.

29.     Defendant Philip Telfer ("Telfer") served as a director of Krispy Kreme from September 2022 until June 2025.

5

30.     Defendant Michelle Weese ("Weese") served as a director of Krispy Kreme from December 2020 until June 2025.

***Relevant Non-Parties***

31.     Non-party Patrick Grismer ("Grismer") has served as a director of Krispy Kreme since June 2025. Grismer serves as a member of the Audit & Finance Committee.

32.     Non-party Bernardo Hees ("Hees") has served as a director of Krispy Kreme since June 2025.

33.     Non-party Easwaran Sundaram ("Sundaram") has served as a director of Krispy Kreme since June 2025.

34.     Non-party Gordon von Bretten ("von Bretten") has served as a director of Krispy Kreme since June 2025.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

35.     By reason of their positions as officers and/or directors of Krispy Kreme, and because of their ability to control the business and corporate affairs of Krispy Kreme, the Individual Defendants owed Krispy Kreme and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Krispy Kreme in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Krispy Kreme and its shareholders.

36.     Each director and officer of the Company owes to Krispy Kreme and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

37.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Krispy Kreme, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38.     To discharge their duties, the officers and directors of Krispy Kreme were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

39.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Krispy Kreme, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

40.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the 1934 Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this

7

Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

41.     To discharge their duties, the officers and directors of Krispy Kreme were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Krispy Kreme were required to, among other things:

(i)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Krispy Kreme' own Code of Conduct;

(ii)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)     Remain informed as to how Krispy Kreme conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Krispy Kreme and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Krispy Kreme' operations would comply with all applicable laws and Krispy Kreme' financial statements and regulatory filings filed with the

8

SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

42.    Each of the Individual Defendants further owed to Krispy Kreme and the shareholders the duty of loyalty requiring that each favor Krispy Kreme' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

43.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Krispy Kreme and were at all times acting within the course and scope of such agency.

44.    Because of their advisory, executive, managerial, and directorial positions with Krispy Kreme, each of the Individual Defendants had access to adverse, non-public information about the Company.

45.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Krispy Kreme.

## KRISPY KREME'S CODE OF CONDUCT

46.    The Company has adopted a Code of Conduct, which provides:

9

[The] Code [of Conduct] applies to everyone at Krispy Kreme, from the Board of Directors to all employees of Krispy Kreme companies, subsidiaries and equity partners. As a Krispy Kremer, we expect you to read, understand, and follow our Code. . . .

Obeying the law, both in letter and in spirit, is one of the foundations on which our ethical policies are built. All Krispy Kremers must respect and obey all applicable governmental laws and regulations.

47.     Krispy Kreme's Code of Conduct further provides:

We are committed to the utmost integrity in our accounting and financial reporting and the manner in which we engage with the investment community, while maintaining a steadfast focus on upholding good stewardship of company resources.

Ensure Accurate Accounting and Financial Reporting

We are committed to providing, full fair, accurate, timely, and understandable disclosure of relevant information to our investors and the Securities and Exchange Commission. We have legal obligations, and it's important to remember that fraudulent or misleading reporting or improper transactions can result in civil or criminal penalties to the individuals involved and to the company.

All transactions must be properly approved and accurately reflected on our books and records, accounting, and financial reporting. Estimates and guidance on future performance, though subject to many uncertainties and risks, should be based on good faith views at the time made. You should also report any error, deficiency or non-compliance with our internal accounting controls.

Our responsibility to be accurate, honest, and complete also applies to day-to-day recordkeeping, such as time clock entries and expense requests. It is never acceptable to take any part, no matter how small your role, in any activity that involves theft, fraud, embezzlement, or misappropriation of company property. Your participation in fraud occurs any time you help conceal, alter, falsify, or omit information in records either for your benefit or at the direction of others. This includes following the rules of reimbursement for business related travel and expenses.

48.     The Code of Conduct continues:

If you think something happened or is about to happen that violates this Code, our policies, or the law, speak up.

You are encouraged to talk to your supervisors, managers and/or the Legal Department if you have questions or concerns. If you are more comfortable, the Krispy Kreme Whistleblower Hotline is also available. Reporting may be anonymous if desired, although we hope you will identify yourself to facilitate communication.

The Whistleblower Hotline is available 24 hours a day, 7 days a week. This line is answered by an independent company and staffed by trained communications specialists whose only responsibility is listening to and reporting your questions or concerns. . . .

Use of any reporting procedure in bad faith will be considered a violation of this Code. Krispy Kreme does not retaliate for any complaint made in good faith. Any person who takes any action whatsoever in retaliation against any Krispy Kremer who has in good faith raised a question or concern about compliance will be subject to serious sanctions, which may include termination.

All reports of suspected violations of our Code or the law will be taken seriously and promptly reviewed. Krispy Kremers must cooperate with our investigations and comply with any corrective measures imposed as a result.

49.     Moreover, Krispy Kreme's Code of Conduct states:

Be loyal to Krispy Kreme and make decisions in the best interest of the Company.

We believe in conducting business with integrity, while avoiding conflicts of interest.

Though we don't want to intrude on your personal life, we expect that your actions will be in the best interests of Krispy Kreme and that you will avoid situations that present a potential or actual conflict between your interests and the company's. . . .

Simply stated, a conflict of interest occurs when a Krispy Kremer's personal interests conflict or interfere with Krispy Kreme's interests. Certain personal or professional relationships, financial interests, and other employment opportunities could create a conflict of interest and affect your ability to make decisions at work objectively.

Here are some scenarios that likely create a conflict of interest:

- accepting compensation or other personal benefits from a source other than Krispy Kreme for your work on behalf of Krispy Kreme

- using your Krispy Kreme position, or Krispy Kreme's property or information, for improper personal gain

- participating in a decision to hire, transfer, promote, or review a family

11

member or someone with whom you have a romantic relationship

- working for or making a sizeable investment in a Krispy Kreme competitor or a company that has a significant financial relationship with Krispy Kreme, such as a material customer or supplier

- accepting gifts, entertainment or favors from Krispy Kreme competitors, customers or suppliers – other than non-cash gifts of nominal value (typically $50 or less per gift and $100 per source per year) or occasional moderate business meals and entertainment, which are generally permissible so long as there is no appearance of a conflict of interest; or

- being involved in an outside activity that competes with our interests.

A conflict of interest may not always be clear-cut. If you are considering entering into a situation where your judgment could be, or could appear to be, influenced in a way that could harm Krispy Kreme, don't proceed without first talking with your supervisor or the Legal Department so that the situation can be reviewed and any necessary actions taken.

## AUDIT & FINANCE COMMITTEE CHARTER

50. Krispy Kreme's Audit & Finance Committee is governed by the Audit & Finance Committee Charter.

51. As set forth in the Audit & Finance Committee Charter, the Audit & Finance Committee is responsible for overseeing, among other things: (i) "the integrity of the Company's financial reporting process and systems of internal controls, including the integrity of the Company's financial statements"; (ii) "compliance with the Company's Code of Conduct and laws and regulations"; and "the independence, qualifications and performance of the Company's independent auditors and internal audit department."

52. The Audit & Finance Committee Charter provides the following "Duties and Responsibilities":

6. Financial Statements. Meet to review the annual and quarterly financial statements and discuss them with management and the independent auditors, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." These

12

discussions shall include the matters required to be discussed under applicable rules of the Public Company Accounting Oversight Board and the SEC, and other such inquiries as the Committee or the independent auditors shall deem appropriate. Based on such review and discussion, the Committee shall (a) approve the inclusion of the Company's unaudited financial statements in the quarterly report on Form 10-Q and (b) recommend to the Board whether the Company's audited financial statements should be included in the annual report on Form 10-K.

The financial statement review will include, as needed, a review of analyses prepared by management setting forth significant issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements, any regulatory disclosures required by the SEC and other regulatory bodies (e.g., environmental, social, and governance matters), and a review of the effect of regulatory and accounting initiatives, as well as off-balance sheet structures on the financial statements of the Company.

7. Earnings Releases. Review and discuss earnings to be issued in the Company's press releases, and periodically review the Company's corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies.

8. Plan and Results of Audit. Discuss with the auditors the nature and rigor of the audit process, receive and review audit reports, receive the recommendation of management as to the fee to be paid to the independent auditors, and provide the auditors full access to the Committee (and the Board) to report on any and all appropriate matters. The Committee also shall review and discuss with management and the independent auditors the results of the annual audit, any audit problems or difficulties, and management's response prior to the filing of the annual report on Form 10-K. . . .

10. Disclosure Controls and Procedures. Periodically review the adequacy and effectiveness of the Company's disclosure controls and procedures to ensure that policies are in place to ensure the accuracy of required and voluntary disclosures.

11. Internal Controls. Discuss with management, the internal auditors and the independent auditors the quality and adequacy of and compliance with the Company's internal controls, including any material weaknesses, significant deficiencies and significant changes in internal controls. Areas of discussion shall include (a) the reliability of financial reporting; (b) the compliance with applicable codes, policies, laws, and regulations; (c) the preservation of the Company's assets; (d) any special steps adopted in light of material control deficiencies; and (e) the adequacy of disclosures about changes in internal control over financial reporting.

The Committee will review any significant matters and regulatory concerns and any fraud involving management or other employees who have a significant role in the Company's internal controls. The Committee also will review internal audit

plans in significant compliance areas. . . .

14. Accounting Principles and Disclosure. Review significant developments in accounting rules. The Committee will review with management recommended changes in the Company's accounting or financial statements and, with the independent auditors, any significant proposed changes in accounting principles, financial statements, and critical accounting matters. . . .

17. Legal Matters. Periodically discuss with management and/or the Chief Legal Officer any legal matters (including the status of pending litigation) that may have a material impact on the Company's financial statements, and any significant reports or inquiries from regulatory or governmental agencies.

18. Ethical Environment. Consult with management on the establishment and maintenance of an environment that promotes ethical behavior, including the establishment, communication, and enforcement of policies or codes of conduct to guard against dishonest, unethical, or illegal activities.

19. Procedures for Complaints. Establish and oversee procedures for the receipt, retention, and treatment of complaints regarding accounting, internal accounting controls, auditing, or federal securities law matters, including procedures for confidential, anonymous submissions.

20. Compliance Program. At least annually, review the Company's Compliance Program and management's system to monitor compliance with the overall program. Meet, at least annually, to review the implementation and effectiveness of the Company's compliance program with the Chief Legal Officer, who shall have the authority to communicate directly to the Committee, promptly, about actual and alleged violations of law or the Code of Conduct, including any matters involving criminal or potential criminal conduct. Review on a quarterly basis a report from the Chief Legal Officer regarding the status of any reports of misconduct. . . .

22. Risk Management. Review and discuss the Company's practices with respect to risk assessment and risk management, and oversee and evaluate the Company's risk management policies in light of the Company's business strategy, capital strength, and overall risk tolerance. The Committee also will evaluate on a periodic basis the Company's investment and derivatives risk management policies, including the internal system to review operational risks, procedures for derivatives investment and trading, and safeguards to ensure compliance with procedures.

## **SUBSTANTIVE ALLEGATIONS**

53. According to its public filings, Krispy Kreme is one of the most well-known sweet treat brands in the world. The Company's Original Glazed® doughnut is universally recognized.

14

Krispy Kreme operates in more than forty countries through its unique network of fresh doughnut shops, partnerships with leading retailers, and a rapidly growing digital business with more than 17,500 fresh points of access.

54.     On October 26, 2022, the Company started conducting a test whereby doughnuts would be sold in McDonald's restaurants in or around Louisville, Kentucky.

55.     On March 26, 2024, the Company and McDonald's announced that they would expand their partnership nationwide starting in the second half of 2024.

56.     On October 10, 2024, the Company reported that it "expects to serve fresh doughnuts daily in more than 1,000 McDonald's restaurants by the end of this year."

57.     However, on February 25, 2025, the Company announced its fourth quarter 2024 financial results (the "Fourth Quarter 2024 Press Release").

58.     In the Fourth Quarter 2024 Press Release, the Company provided: "In the U.S. segment, net revenue declined $50.9 million, or 17.2%," due in part to "a decline in retail sales" with "DFD average sales per door per week decreased . . . driven by changing customer mix."

59.     Krispy Kreme further disclosed "net revenue of $404.0 million, a decline of 10.4%."

60.     The Fourth Quarter 2024 Press Release stated:

*U.S.: In the U.S. segment, net revenue declined $50.9 million, or 17.2%, largely attributable to* the sale of Insomnia Cookies ($57.4 million impact), *a decline in retail sales*, and the 2024 Cybersecurity Incident; partially offset by growth in the DFD business. Organic revenue declined by 1.2%, with an estimated headwind of 460 basis points attributable to the 2024 Cybersecurity Incident. Sales per Hub in the U.S. remained consistent at $4.9 million and *DFD average sales per door per week decreased, as expected, and were $631, driven by changing customer mix.*[1]

U.S. Adjusted EBITDA decreased 44.0% to $23.6 million with Adjusted EBITDA margin contraction of 460 basis points to 9.6%, of which an estimated 350 basis points were attributable the 2024 Cybersecurity Incident.

---

[1] Unless otherwise indicated, all emphasis is added.

61.     The Fourth Quarter 2024 Press Release further stated:

Krispy Kreme's fourth quarter results reflect the strength of the omni-channel model, *delivering net revenue of $404.0 million, a decline of 10.4%, compared to $450.9 million in the same quarter last year* primarily due to the sale of a majority ownership stake of Insomnia Cookies in the third quarter of 2024 ($101 million impact) and the 2024 Cybersecurity Incident (estimated $11 million impact). Organic revenue grew 1.8%, driven by the Company's first quarter of Delivered Fresh Daily ("DFD") sales in excess of $100 million worldwide. Organic revenue was impacted adversely by an estimated 280 basis points from lost revenue linked to the 2024 Cybersecurity Incident.

GAAP net loss was $22.2 million, compared to income in the prior year of $1.9 million. GAAP Diluted Loss per Share was $(0.13), a decline of $(0.15) from the same quarter last year.

*Global Points of Access grew 24.1%, linked to the Company's accelerating U.S. expansion now reaching more than 1,900 McDonald's restaurants with daily deliveries of Krispy Kreme doughnuts, alongside growth internationally.*

Adjusted EBITDA in the quarter declined 28.4% to $45.9 million, linked to an estimated $10 million dollar impact from the 2024 Cybersecurity Incident, with Adjusted EBITDA margins contracting 280 basis points to 11.4%. Adjusted EBITDA Margin reflects an estimated 210 basis point negative impact from the 2024 Cybersecurity Incident.

Adjusted Net Income, diluted declined to $1.2 million in the quarter from $15.1 million in the same quarter last year. Adjusted EPS declined $0.08 to $0.01 from $0.09 in the same quarter last year, due to increased interest expense and depreciation and amortization and an estimated impact of $0.04 due to the 2024 Cybersecurity Incident. . . .

62.     The Fourth Quarter 2024 Press Release continued:

*Krispy Kreme issues the following guidance for the full year 2025 (vs FY2024)*

• Net Revenue of $1,550 to $1,650 million

• Organic Revenue growth of +5% to +7%

• Adjusted EBITDA of $180 to $200 million

• Adjusted EPS of $0.04 to $0.08

• Income Tax rate between 32% and 36%

16

•Capital Expenditures of 6% to 7% of net revenue

•Interest Expense, net of $65 million to $75 million

The company expects leverage to trend towards 4.0x by year end 2025.

63.     On February 27, 2025, Krispy Kreme filed its Form 10-K with the SEC for the

Company's fiscal year ended December 29, 2024 (the "2024 Form 10-K").

64.     The 2024 Form 10-K provided:

We added net 3,508 new DFD Doors during the fiscal year as we continue to focus on the deployment of our Hub and Spoke model and our expansion into QSR channels. We plan to continue adding new locations and expanding our digital platform in order to extend the availability of and access to our products. *We are excited about our partnership with McDonald's and the phasing of the U.S. national rollout, which we believe has validated the attractiveness of the QSR channel.*

65.     The 2024 Form 10-K was signed by Defendants Andrada, Ashukian, Bell, Capel,

Charlesworth, Deno, Goudet, Pleuhs, Roberts, Telfer, and Weese.

66.     On April 23, 2025, Krispy Kreme issued a press release providing:

"Welcoming Bernardo [Hees] to our Board at a pivotal time for Krispy Kreme will be invaluable as we seek to maximize shareholder value through *our two largest growth opportunities: profitable U.S. expansion* and capital-light international growth," said Josh Charlesworth, Krispy Kreme CEO.

67.     The above-referenced statements were materially false and misleading and failed

to disclose, among other things, that: (i) demand for Krispy Kreme doughnuts at McDonald's

restaurants declined significantly following the launch of Krispy Kreme's and McDonald's

partnership; (ii) demand for Krispy Kreme doughnuts at McDonald's restaurants was a leading

factor in Krispy Kreme's decline in sales; (iii) Krispy Kreme's partnership with McDonald's was

not financially profitable and the lack of profitability posed a material risk to the partnership's

continuation; (iv) Krispy Kreme would be stopping further expansion into McDonald's

restaurants; and (v) as a result of the foregoing, Defendants' positive statements about Krispy

Kreme's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

68.     Then on May 8, 2025, Krispy Kreme announced its first quarter 2025 financial results in a Form 10-Q filed with the SEC as well as in a press release (the "First Quarter 2025 Press Release").

69.     Krispy Kreme disclosed a "net loss of $33.4 million, compared to prior year net loss of $6.7 million."

70.     The Company also reported that "net revenue was $375.2 million . . . a decline of 15.3%."

71.     Krispy Kreme reported that it was "reassessing [its] deployment schedule together with McDonald's" and "withdrawing [its] prior full year outlook and not updating it" at least in part due to "uncertainty around the McDonald's deployment schedule."

72.     The First Quarter 2025 Press Release provided:

• Net revenue of $375.2 million

• Organic revenue declined 1.0% to $374.7 million

• GAAP net loss of $33.4 million

• Adjusted EBITDA of $24.0 million

• GAAP cash used for operating activities of $20.8 million

• Global Points of Access ("POA") increased 3,168, or 21.4%, to 17,982

73.     Furthermore, the First Quarter 2025 Press Release disclosed:

Krispy Kreme's first quarter results reflect continued investment ahead of growth in the Company's U.S. nationwide expansion and wider adoption of the capital-light international franchise model. Net revenue was $375.2 million in the first quarter of 2025, a decline of 15.3% or $67.5 million, primarily due to the $64.3 million reduction associated with the divestiture of a majority stake in Insomnia Cookies in the third quarter of fiscal 2024. In line with expectations, organic

18

revenue declined $3.6 million, or approximately 1.0%, as growth in Global Points of Access and Delivered Fresh Daily ("DFD") revenues were more than offset by expected consumer softness leading to a decline in doughnut shop transaction volume.

GAAP Net Loss was $33.4 million, compared to prior year net loss of $6.7 million. GAAP diluted loss per share was $0.20, compared to a loss of $0.05 in the same quarter last year.

Adjusted EBITDA declined to $24.0 million, with Adjusted EBITDA Margin declining to 6.4% as the Company invests ahead of growth and navigates a challenged global consumer backdrop linked to macroeconomic, weather, and inflationary factors. Adjusted Net Loss, diluted was $8.8 million in the quarter. Adjusted Diluted loss per share was $0.05 in the quarter.

74.     Additionally, in the First Quarter 2025 Press Release, the Company stated:

As of March 30, 2025, Krispy Kreme doughnuts are now available in more than 2,400 McDonald's restaurants. *The Company is reassessing the deployment schedule together with McDonald's while it works to achieve a profitable business model for all parties and does not expect to launch in any additional restaurants in the second quarter of 2025.*

Krispy Kreme continues to believe in the long-term opportunity of profitable growth through the U.S. nationwide expansion including McDonald's.

*Given macroeconomic softness and the uncertainty around the McDonald's deployment schedule, the Company is withdrawing its prior full year outlook and not updating it at this time.*

75.     Following this news, Krispy Kreme's stock price fell 24.71%, from a closing price of $4.33 per share on May 7, 2025 to $3.26 per share on May 8, 2025.

76.     As a result of the foregoing, the Securities Class Action was filed against the Company, Charlesworth, and Ashukian, captioned *Cameron v. Krispy Kreme, Inc.*, Case No. 3:25-cv-00332 (W.D.N.C.).

77.     As a result, the Company has incurred, and will continue to incur, substantial costs to defend itself in the Securities Class Action, and is exposed to massive potential class-wide liability.

19

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

78.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

79.     Krispy Kreme is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

80.     Plaintiff is a current shareholder of Krispy Kreme and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

81.     A pre-suit demand on the Board of Krispy Kreme is futile and, therefore, excused. The Board consists of Defendants Andrada, Capel, Charlesworth, Deno, and Pleuhs, and non-parties Grismer, Hees, Sundaram, and von Bretten.

82.     Given the factual allegations set forth herein, Plaintiff has not made a demand on the Board to bring this action against the Individual Defendants.  A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board is capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action.

83.     The Individual Defendants either knew, or should have known, that the statements they issued, or caused to be issued on the Company's behalf, were materially false and misleading, but they took no steps in a good faith effort to prevent or remedy that situation.

84.     Each of the Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the

Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

85. Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

86. The Individual Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

87. Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

88. Individual Defendants Deno and Pleuhs are not disinterested or independent. Deno and Pleuhs are members of the Audit & Finance Committee, the purpose of which is to assist the Company's directors with fulfilling their oversight responsibilities regarding, among other things, accounting, legal, regulatory, and public disclosure requirements. Therefore, Deno and Pleuhs knowingly or recklessly allowed the issuance of the aforementioned improper statements.

89. Defendants Andrada and Pleuhs are not disinterested or independent. Andrada and Pleuhs are members of the Remuneration & Nomination Committee, the purpose of which includes overseeing the corporate governance policies and procedures of the Company. Defendants Andrada and Pleuhs failed to review regulatory developments and governance best

21

practices for the Company and allowed the Individual Defendants to disseminate material misinformation as set forth above.

90.     The Individual Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Individual Defendants to also adhere to the Company's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

91.     Defendants Andrada, Capel, Charlesworth, Deno, and Pleuhs are not disinterested or independent. Defendants Andrada, Capel, Charlesworth, Deno, and Pleuhs each signed the 2024 Form 10-K, which, as alleged above, was materially false and misleading.

92.     Individual Defendant Charlesworth is not disinterested or independent. Charlesworth is CEO and President of the Company, and he derives substantial compensation from his relationship with the Company. As alleged above, Charlesworth was directly involved in and perpetrated the scheme alleged herein. Charlesworth also engaged in improper insider sales while in possession of material non-public information about the Company, netting total proceeds of approximately $58,000. Moreover, Charlesworth was named as a defendant and, therefore, faces a substantial likelihood of liability, in the Securities Class Action based on substantially the same wrongdoing alleged herein. Thus, Charlesworth is not disinterested or independent.

93.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intential, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

94.    The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

95.    Accordingly, for all of the reasons set forth above, at least a majority of the Company's current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

96.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

98.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

99.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and

procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

100. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

101. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

102. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their

24

fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

104.     Plaintiff, on behalf of Krispy Kreme, has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants for Unjust Enrichment**

105.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Krispy Kreme.

107.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Krispy Kreme that was tied to the performance or artificially inflated valuation of Krispy Kreme, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

108.     Moreover, as alleged herein, Individual Defendant Charlesworth engaged in improper insider sales while in possession of material non-public information about the Company, netting total proceeds of approximately $58,000.

109.     Plaintiff, as a shareholder and a representative of Krispy Kreme, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

110.     Plaintiff on behalf of Krispy Kreme has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

111.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

113.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

114.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

115.    Plaintiff, on behalf Krispy Kreme, has no adequate remedy at law.

## COUNT V

### Against Individual Defendants Charlesworth and Ashukian for Contribution Under Sections 10(b) and 21D of the 1934 Act

116.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.    Krispy Kreme and Individual Defendants Charlesworth and Ashukian are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the 1934 Act, and Rule 10b-5 promulgated thereunder by the SEC. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due

26

to Defendants Charlesworth's and Ashukian's willful and/or reckless violations of their obligations as officers and/or directors of Krispy Kreme.

118.    Defendants Charlesworth and Ashukian, because of their positions of control and authority as officers and/or directors of Krispy Kreme, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of Krispy Kreme, including the wrongful acts complained of herein and in the Securities Class Action.

119.    Accordingly, Defendants Charlesworth and Ashukian are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the 1934 Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the 1934 Act.

120.    As such, Krispy Kreme is entitled to receive all appropriate contribution or indemnification from Defendants Charlesworth and Ashukian.

121.    Plaintiff, on behalf Krispy Kreme, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

27

C. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to:

• strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

• strengthening the Company's internal reporting and financial disclosure controls;

• developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

• strengthening the Board's internal operational control functions;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: June 25, 2025

**HAUSLER LAW FIRM, PLLC**

By: */s/ Kurt F. Hausler*
_____

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Gina M. Serra
825 East Gate Blvd., Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Facsimile: (302) 654-7530
sdr@rl-legal.com
gms@rl-legal.com

Kurt F. Hausler
NC Bar No. 22103
524 East Boulevard
Charlotte, NC 28203
Telephone: (704) 247-3255
Facsimile: (704) 247-3267
Email: khausler@hauslerlaw.com

*Attorneys for Plaintiff*

28

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
jgrabar@grabarlaw.com

Docusign Envelope ID: 862D900E-947C-41A9-89F7-D47211649F3C

## VERIFICATION

I, GEORGE SCHEULEN, have reviewed the allegations made in this Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Krispy Kreme, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: _6/24/2025_____

DocuSigned by:

_George Scheulen_

_____
GEORGE SCHEULEN